NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1013n.06

**Nos. 10-5271, 10-5540**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Sep 17, 2012*
DEBORAH S. HUNT, Clerk

TINNA DILTS, et al.,

     Plaintiffs-Appellants,

v.

UNITED GROUP SERVICES, LLC, et al.

     Defendants-Appellees.

                                 /

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

BEFORE:    CLAY, GIBBONS, and WHITE, Circuit Judges.

       **CLAY, Circuit Judge.**  Tinna Dilts, as ancillary administratrix of the Estate of Rickie Dilts, and Sandi Neace, as administratrix of the Estate of Matthew Collins, brought a wrongful death action against Defendants Maxim Crane Works, L.P., United Group Services, LLC, North American Stainless Steel, and Siemens Industry, Inc. The district court granted summary judgment to all three Defendants.  Dilts argues on appeal that the district court erred in excluding the testimony of his expert witness and in granting summary judgment (Neace's claims were settled and dismissed in 2008).   For the reasons set forth below, we **REVERSE** the district court's decision to exclude Plaintiff's expert opinion, **REVERSE** the district court's order granting summary judgment to Maxim, and **AFFIRM** the district court's order granting summary judgment to Siemens Industry, Inc. and North American Stainless.

## BACKGROUND

### A. Factual Background

Rickie Dilts ("Dilts") and Matthew Collins ("Collins") were employed as ironworkers by United Group Services, Inc. ("UGS"). On July 28, 2006, they were assigned to work at North American Stainless ("NAS") in Carroll County, Kentucky, to reset the roof panel on a structure known as the "doghouse."[1] There were a number of steps involved in the process of assembling the roof panel. A crew of UGS employers worked on the ground to prepare the panels to be lifted by a crane. Each panel comprising the doghouse structure weighed between 1,000 and 6,000 pounds. The grounds crew then communicated either by hand signal or radio to the crane operator to lift the panels. The crane operator continued to follow the instructions given by a UGS employee as to the proper placement of the panel. Once the UGS employee determined the location for the panel, an employee would release the panel from the crane's rigging while another would weld the panel into its permanent location on the wall and the I-beam.

On July 28, Dilts and Collins were responsible for releasing the rigging from the crane to set the panel on top of the doghouse. They were working approximately eighty feet from the ground wearing only a safety harness and lanyard. Neither man was physically "tied off" or secured to the doghouse. Dilts communicated via radio to Travis Gunn ("Gunn"), the crane operator who worked for Maxim Crane Services L.P ("Maxim"), with instructions on where to move the panel. Gunn was working "in the blind," as he was unable to see where Dilts and Collins were standing or where the

---

[1]The "doghouse" is a large steel structure built inside the factory at NAS. It houses an electric furnace used to melt stainless steel. The purpose of the doghouse is to capture the fumes and exhaust produced during the melting of stainless steel in the electric furnace.

panel was being placed. Dilts instructed Gunn to first lower the panel and then lower the crane so that the panel could be disconnected from the crane's rigging and then properly secured between the I-beam and the wall. At his deposition, Gunn stated that Dilts said over the radio to "cable down, cable down, stop and hold that." Gunn then recalls waiting for Dilts to signal to "boom up and swing away" the crane. Gunn followed the command to cable down, but no further command was given and, according to Gunn, no additional movement of the crane was made. Soon after, the panel on which Dilts and Collins were standing fell to the floor, causing both men to fall eighty feet to their deaths.

The parties dispute how the panel fell. There were a number of witnesses identified by both Plaintiffs and Defendants who testified to both the events preceding and following the panel's descent, but none of the witnesses observed the actual accident. Roger Perry ("Perry") and Lori Day ("Day"), both employed by James Welding Company, were working approximately twenty feet from Dilts and Collins. Day and Perry were responsible for welding the panels on the doghouse. Day observed Dilts and Collins moving the panel and then setting it into place between the I-beam and the wall. Day stated at her deposition that she saw visible slack in the crane's rigging just prior to Dilts' death. The last thing she observed was Collins loosening the pin to separate the shackle from the panel to take the rigging off his side of the panel. Although Day noticed that Collins had his strap completely separated from the panel, she could not tell whether Dilts had done the same to his side. She testified that she turned around, put her hood down, and started welding a panel held by Perry. Day stated that shortly after she heard a very loud noise, turned around, and realized that Dilts and

3

Collins had fallen to the ground and that the panel also fell. She noticed that the crane's straps were hanging straight down and motionless, and a pin was missing from one shackle.

Perry corroborated Day's testimony, stating at his deposition that he also observed Dilts and Collins working on the doghouse installing a panel. According to Perry, his last visual memory of Dilts and Collins was the two of them trying to put the panel into the I-beam. He then turned around with his back facing Collins and Dilts. Perry testified that the accident occurred shortly after and when he turned around to see what happened, he noticed that only one end of the panel was properly placed. Perry also corroborated Day's testimony by stating that he also observed that one of the pins on the shackle was inserted and screwed in properly on the strap but the other shackle was hanging without a pin.

Juan Corrales ("Corrales"), a welder for UGS, was also working on the doghouse in a man basket. He testified at his deposition that he did not see the accident but heard a very loud noise and felt a rush of air move past him in his basket. He immediately turned around and noticed that the panel and the two men had fallen to the ground. According to Corrales, shortly after the accident he looked up and noticed that the rigging and the shackles were hanging between the panels and a pin was missing from one of the shackles after the panel fell.

Plaintiffs hired Stuart Nightenhelser, an accident reconstructionist for Wolfe Technical Services, as their expert witness. Plaintiffs retained Nightenhelser to examine and analyze physical and photographic evidence of the accident and to provide expert analysis and opinion as to the cause of the accident. Nightenhelser inspected the crane's straps and panel at the worksite and also viewed photographs to compare the worksite before and after the accident. In his report, Nightenhelser

4

concluded that the panel "became dislodged by [the] cabling up action of the crane," which lifted the panel out of its position and resulted in the rotation of the panel, damage to the support structures, and the crane's subsequent release of the panel to the floor.

## B.    Procedural History

On May 7, 2007, Tinna Dilts and Sandi Neace filed suit in the Circuit Court of Carroll County, Kentucky. The complaint alleged that the construction-accident deaths of Rickie Dilts and Matthew Collins were due to negligence on the part of NAS, the owner of the worksite; the general contractor on the project;Voest-Alpine Industries, Inc. ("VAII") (which was later acquired by Siemens Energy and Automation ("Siemens")); VAII's installation subcontractor and Collins and Dilts employer, UGS; and UGS' crane subcontractor Maxim. UGS removed the matter to the U.S. District Court for the Eastern District of Kentucky pursuant to 28 U.S.C. § 1441 on the basis of diversity jurisdiction.

Defendant UGS filed a motion for summary judgment on December 6, 2007. The district court granted the motion in part on September 22, 2008, and dismissed Plaintiffs' negligence claims against UGS on the grounds that Plaintiffs received workers' compensation death benefits from UGS' insurance carrier and thus were barred from bringing any tort claim against UGS under the exclusivity provision of the Kentucky Workers' Compensation Act, KRS 342.0011, *et seq*.

On July 9, 2009, Defendant Siemens also filed a motion for summary judgment against Plaintiffs, arguing that Siemens is a contractor as defined under Kentucky's Worker Compensation Statutes and thereby immune from tort liability for claims brought by its subcontractors' employees.

NAS filed a separate motion for summary judgment on the remaining claims. The district court granted the motions for summary judgment on February 5, 2010.

Defendant Maxim also moved for summary judgment, arguing that the company should not be vicariously liable for the acts of its crane operator. The district court denied Maxim's motion on March 25, 2009. Maxim then filed a motion in limine to exclude the testimony of Plaintiffs' expert witness Nightenhelser on July 23, 2009 and also filed a second motion for summary judgment. Maxim moved for a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine the admissibility of Nightenhelser's expert testimony. On February 25, 2010, the district court granted Maxim's motion for summary judgment, concluding that Nightenhelser's expert testimony was inadmissible because Nightenhelser failed to use valid and reliable principles to explain how the crane moved the panel out of position causing the death of Dilts and Collins. The district court also granted Maxim's motion for summary judgment on both the common-law negligence and negligence *per se* claims. Plaintiffs timely appealed.

## ANALYSIS

### I.      Admissibility of Expert Witness Testimony

#### A.      Standard of Review

We review the exclusion of expert testimony for an abuse of discretion. *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). A district court "has broad discretion in the matter of the admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous." *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) (internal citation omitted). "A district court abuses its discretion if it bases its ruling on an erroneous view of

the law or a clearly erroneous assessment of the evidence." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (internal quotation marks omitted).

### B.      Nightenhelser's Qualifications

Rule 702 of the Federal Rules of Evidence, which Kentucky has adopted, governs the admissibility of expert testimony. The rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[2]

Under Kentucky law, a qualified expert is defined as one who bases his or her opinion on "knowledge, skill, experience, training, or education" in a given area or subject. *Mondie v. Commonwealth*, 158 S.W.3d 203, 212 (Ky. 2005). Maxim argues that Nightenhelser lacks the proper qualifications to testify about the circumstances of the accident and therefore should be prohibited from offering testimony. The district court did not specifically address Nightenhelser's qualifications as an expert in its opinion and order to exclude his testimony other than noting his academic and professional experience.

Nightenhelser testified at his deposition that he obtained a Bachelor of Science in physics and mathematics from Butler University and has worked in accident reconstruction for over a decade. In his position, Nightenhelser regularly applies the laws of physics and mathematics to support his

---

[2] Stylistic changes were made to this rule in 2011.

analyses and conclusions for the reconstruction of accidents. Nightenhelser estimated that he has worked in over 1,000 cases, involving construction equipment, vehicles, and the construction of buildings or other structures.

Based on this testimony, Nightenhelser is qualified as an expert on the subject of accident reconstruction. That Nightenhelser may have lacked familiarity with some aspects of industrial accidents does not constitute sufficient grounds for disqualification, as "[s]uch lack of familiarity affects the witness' credibility, [and] not his qualifications to testify." *Davis v. Combustion Eng'g Inc.*, 742 F.2d 916, 919 (6th Cir. 1984.) Accordingly, we conclude that Nightenhelser possessed the requisite knowledge, practice, skill, and experience to qualify as an expert in this matter.

## C. Reliability

Maxim objects to Nightenhelser's testimony, arguing that the expert's conclusions were based on mere speculation. In particular, Maxim argues that Nightenhelser's opinion is unreliable because he failed to perform any scientific analysis or calculations to support his conclusions.

In *Daubert*, the Supreme Court identified a non-exhaustive list of factors to be considered when assessing the reliability of an expert's testimony. The factors include: (1) whether a theory or technique can be and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation, and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Daubert*, 509 U.S. at 592–94. We have recognized that the *Daubert* factors are neither definitive nor exhaustive and may not be applicable in evaluating the reliability of expert

testimony in every case. *See Nelson v. Tenn. Gas Pipeline Co.,* 243 F.3d 244, 251 (6th Cir. 2001). *Kumho Tire* further clarified that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141–42 (1999). However, we must still conduct a review of the "record to determine whether the district court erred in its assessment of the relevance and reliability of the expert testimony." *Clay v. Ford Motor Co.*, 215 F. 3d 663, 667 (6th Cir. 2000) (internal citation omitted).

To determine whether expert testimony is relevant and reliable requires a "preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002) (citing *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000)). An expert opinion must not rest purely on speculation. *Tamarz v. Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010). However, Rule 702 does not require an expert to have absolute certainty in formulating his opinion. Rather, "experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the 'expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn,* 233 F.3d at 388 (quoting *Daubert*, 509 U.S. at 592). "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire*, 526 U.S. at 152.

The district court granted Maxim's motion to exclude Nightenhelser's testimony, concluding that the expert failed to use valid and reliable principles that explain how the panel lifted out of its

original position and ultimately fell to the ground. The district court noted that Nightenhelser's conclusion that the panel was lifted out of its position by the crane is unsupported by the evidence and that Nightenhelser failed to explain this conclusion in his report. We disagree and determine that the district court abused its discretion in its analysis of Nightenhelser's testimony. In reaching this conclusion, we highlight several aspects of Nightenhelser's analysis and calculations.

At his deposition, Nightenhelser testified that he inspected the crane's straps, shackles, and cable of the rigging and the dislodged panel at the accident site. Upon inspection, he observed a depression on or near one corner of the panel and some yellow paint. He also testified that the end pieces on each end of the panel were "bent, canted inward," which meant that both ends of the panel struck support surfaces during the fall, causing an inward bent. Nightenhelser determined that the shape of the depression was consistent with the shape of the handrail. Based on the physical evidence, he concluded that the panel rotated counterclockwise 180 degrees and struck the yellow handrail located in between the top of the doghouse and the ground, which caused the downward depression in the panel. He further concluded that the scrape marks on the panel demonstrated that the panel contacted the I-beam and shifted out of position against the ductwork of the doghouse structure.

Nightenhelser also conducted a photogrammetric analysis, which entails using known measurements of objects in a photograph to extract measurements of, or measurements to, objects that are not known. In addition, he performed calculations and algebraic equations using a computer program to determine the length and width of the panel. He testified that after conducting his inspections at the accident site he put a digital photograph on a computer screen, used a mouse to

identify points and create vectors of the crane and the panel, and then inserted that information into a computer program to determine the natural position of the shackles and also to identify the damage on the I-beam. Based on his analysis, Nightenhelser concluded that the only mechanism that could lift the panel out of position to strike the I-beam and then rotate 180 degrees was the crane.

Maxim claims that Nightenhelser has never worked on cases involving the operation of a crane nor has he specifically reviewed accident reconstruction with respect to the rigging or lifting of materials. We believe that Maxim's allegations are not well taken. Nightenhelser was not rendered unqualified solely because he could not answer every question posed by Maxim's attorneys. An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact. *See Sarkas ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293–94 (6th Cir. 2007). Rather, "*Daubert* and Rule 702 require only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts on the case at hand . . . not that they *know* the answer to all the questions a case presents-even to the most fundamental questions." *Jahn*, 233 F.3d at 390.

Nightenhelser did not testify beyond the scope of his expertise and stated that his opinion was based only on the information obtained by the photographs, his observation of the worksite, witness testimony, and calculations derived from this information. It is the responsibility of the jury to evaluate the expert's conclusions and to weigh the expert's evidence against the evidence presented by the parties. *See* Fed. R. Evid. 702.

In sum, Nightenhelser performed the necessary calculations and  sufficiently relied on the laws of physics and mathematics generally employed in accident reconstruction to determine how

11

the panel dislodged and rotated out of position leading to the death of Dilts. Accordingly, the district court abused its discretion in excluding Nightenhelser's testimony.

**II.     Defendants' Summary Judgment Motions**

**A.     Standard of Review**

We review *de novo* a district court's decision to grant summary judgment. *Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 448 (6th Cir. 2002). Summary judgment is appropriate if the pleadings, the discovery, and the disclosure materials on file, and any affidavits "show [] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.     Negligence Action Against Maxim**

To recover in a negligence action under Kentucky law, a plaintiff must prove: 1) the defendant owed the plaintiff a duty of care, 2) the defendant breached its duty, and 3) an injury that was caused by the breach. *T&M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006). "The absence of any one of the three elements is fatal to the claim." *Illinois Central R.R. v. Vincent*, 412 S.W.2d 874, 876 (Ky. 1967). The court must determine as a matter of law whether Defendant owed a duty to Plaintiffs; however, whether Defendant breached that duty is a question of fact for the jury. *Pathways, Inc, v. Hammons*, 113 S.W. 3d 85, 89 (Ky. 2003). "Injury consists

12

of what hornbooks separate into two distinct elements: actual injury or harm to the plaintiff *and* legal causation between the defendant's breach and the plaintiff's injury." *Id*. at 88-89.

The district court held that in the absence of Nightenhelser's expert testimony, Plaintiffs failed to produce evidence to show that Gunn caused the panel to move resulting in the death of Dilts and Collins. On appeal, Plaintiffs argue that the deposition testimony of Day, Perry, and Nightenhelser provide sufficient evidence that only the crane could have lifted the panel out of position. Plaintiff argues that Gunn caused the crane to lift up approximately three to five feet, pulling the panel out of its set position, leaving it unsupported from the steel structure of the doghouse.

### 1.    Duty and Breach

Kentucky has adopted a "universal duty" of care that imposes on every person "a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury." *Grayson Fraternal Order of Eagles v. Claywell*, 736 S.W.2d 328, 332 (Ky. 1987), *superceded by statute on other grounds*, Ky. Rev. Stat. § 413.2.  Foreseeability is based on "what the defendant was aware of at the time of the alleged negligent act and not on what the defendant should have known in hindsight." *Pathways*, 113 S.W. 3d at 90.  Under Kentucky law, the existence of a duty of care to the plaintiff and its underlying foreseeability inquiry presents an issue of law.  *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W. 2d 245, 248 (Ky. 1992).  In this case, we find that it is reasonably foreseeable for Maxim to be aware that an injury may occur when operating a crane.  The foreseeability standard does not require that the "particular, precise form of injury be foreseeable [but rather] it is sufficient if the probability of injury of some kind to persons within the natural range of

effect of the alleged negligent act could be foreseen." *Isaacs v. Smith*, 5 S.W. 3d 500, 502 (Ky. 1999). We find that an ordinary person could foresee injuries from a crane when working with limited or poor visibility and lifting panels weighing between 1,000 to 3,000 pounds. Crane operations require well-coordinated activities involving workers, equipment, and materials to lift, connect, and disconnect large and heavy panels.

Having concluded that a duty of care existed, it is a question of fact that must be left to the jury as to whether Maxim breached its duty in operating the crane.

### 2.    Injury and Causation

Maxim argues that Plaintiffs have not presented any evidence to show that the crane was the probable cause of the accident nor have they excluded numerous other possible causes for the accident. Further, Maxim contends that there is an absence of testimony of any defect either in the crane or its operation. Plaintiffs primarily rely on the expert testimony of Nightenhelser and also the testimony of Lori Day to prove that the crane moved and caused the panel to become dislodged.

Under Kentucky law, a plaintiff is required to prove that the defendant's negligent conduct was a "substantial factor in bringing about the harm." *Pathways*, 113 S.W.3d at 92 (quoting Restatement (Second) of Torts § 431 (1965)). In making this determination, the court views all of the facts in favor of the non-movant. *Id*. Causation is an element which may be proved either by direct or circumstantial evidence. However, if "a party seeks to establish causation by circumstantial evidence the evidence must be sufficient to tilt the balance from possibility to probability." *Calhoun v. Honda Motor Co. Ltd.*, 738 F.2d 126, 130 (6th Cir. 1984) (internal citations and quotation marks omitted). If the court determines that the jury may not reasonably differ, the

14

court decides the issue of causation as a matter of law. *See* Restatement (Second) of Torts § 434(1)(c) (1965).

Plaintiffs contend that there are issues of material fact as to whether Maxim caused the panel to prematurely release from the crane. They allege that the testimony of Day and Nightenhelser prove that Gunn lifted the crane without any signal from Dilts or any other worker, and that his actions caused the panel to move out of position, causing Dilts and Collins to fall.

Plaintiffs also argue that Nightenhelser's testimony independently creates an inference that the crane was the only possible mechanism that would cause the panel to fall. Plaintiffs rely on the fact that Nightenhelser eliminated other potential causes for the panel to dislodge and that the panel fell from the I-beam first. When asked by Maxim's attorney whether something other than the crane could have caused the panel to fall, Nightenhelser responded that he was unaware of any other mechanism other than the crane that could move the panel. At Nightenhelser's deposition, the following exchange occurred with the attorney for Maxim:

> Q: If you go to the page 2 of your report . . . You say, it is our opinion that the ceiling panel became dislodged by cabling up action of the crane. What's that opinion based on?
>
> A: Lack of physical evidence of interaction of the panel itself with the ductwork and the I-beam that would have been there had it simply fallen out, and the fact that the crane is the item in the whole equation that has the power to move that much mass and get it to fall through the hole.
>
> Q: Do you believe that the panel could not have fallen through the hole unless it was moved by the crane?
>
> A: I presume that somebody could have grabbed a – – what they call sleever bars, or something like that, and wedged it into the open end and let it fall. They were obviously able to move them around a bit with those sleever bars.

Q: Was there any other way that the panel could have fallen besides being moved by the crane or being moved by a sleever bar?

A: Not by any other mechanism that I know was up there.

Q: Well, I think you said just a few sentences ago that the panel, you know, would not just fall?

A: It wouldn't just fall of its own accord. You could knock it somewhere with a sledgehammer several times, that could do it. There are ways to get it to move, but not any that make sense.

(R. 241: Dep. Tr. of Stuart Nightenhelser Dep 136–37.) The conclusion that the crane was the only mechanism to move the panel was also stated in Nightenhelser's expert report. In addition, Plaintiffs note that both Maxim and UGS' expert also assumed that the panel fell from the I-beam first.

In order to survive summary judgment, Plaintiffs are required to present evidence showing not only that it is possible that the crane caused the panel to fall but that the fall was more likely than not because of the crane. That requires Plaintiffs to prove that "defendant's conduct ha[d] such an effect in producing the harm as to lead reasonable men to regard it as a cause," *Pathways, Inc.*, 113 S.W. 3d at 92 (citing Restatement (Second) of Torts § 431 cmt. a (1965)).

In the absence of testimony from witnesses who were in a position to observe exactly what transpired at the moment of the accident, the central issue is whether the remaining evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). The record demonstrates that the crane operator adhered to all of the standard operating procedures and that every step of the process is in compliance with Maxim's safety protocols, except for the final step, a step which Nightenhelser identifies as causing the crane to lift

16

the panel out of position and ultimately leading to the deaths of Dilts and Collins. Since Nightenhelser excluded all other possibilities for the movement of the panel, we are left with only the possibility presented by Plaintiffs' expert and Maxim's witnesses. Although Maxim's witnesses present an alternative theory, evidence that the crane was the sole cause for moving the panel is sufficient to create a genuine issue of material fact. Nightenhelser's testimony presented a reasonable probable cause for the accident based on the physical evidence, and we find his conclusion is appropriate evidence to bring before a jury. *See Columbia Gas of Ky., Inc. v. Tindall*, 440 S.W. 2d 785, 789 (Ky. App. 1969) (finding that the issue of whether Columbia Gas conclusively established that an explosion was not caused by natural gas or that it was caused by volatile vapors was a question for the jury). Similarly, Nightenhelser's inability to identify all of the possible processes that could have caused the panel to be moved by the crane goes to the weight to be given to his testimony. Therefore, we reverse the decision of the district court granting Maxim's motion for summary judgment.

## C. Siemens is a Contractor Under Kentucky law

Plaintiffs next argue that the district court erred in granting summary judgment to Siemens on its claim that it is entitled to up-the-ladder immunity as a contractor for UGS. Plaintiffs challenge Siemens' classification as a contractor and argue that the company meets none of the relevant criteria to be considered a contractor under Kentucky law.

According to Kentucky law, "up-the-ladder immunity refers to a contractor's immunity from tort lawsuits where the plaintiff was injured at work and workers' compensation benefits are the plaintiff's exclusive remedy under Kentucky Revised Statutes ("KRS") 342.690 [and KRS

342.610].” *Beaver v. Oakley*, 279 S.W. 3d 527, 528, n.1 (Ky. 2009).[3] In this case, NAS contracted with Siemens to design, manufacture, and install an Electric Arc Furnace (“EAF”). For the NAS contract, Siemens subcontracted a portion of the work to UGS, which included the installation of the doghouse.[4]

In *General Electric Company v. Cain*, the Kentucky Supreme Court addressed the issue of when an owner of a premises is a contractor for purposes of KRS 342.610(2)(b). 236 S.W.3d 579 (Ky. 2007). The court stated that whether a premises owner is entitled to immunity under a worker's compensation statute depends on whether the worker was injured while performing work that was

_____

[3]KRS 342.690(1) reads in relevant part:

If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. For purposes of this section, the term “employer” shall include “contractor” covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact secured the payment of compensation . . . .

KRS 342. 610(2) reads in relevant part:

A contractor who subcontracts all or any part of a contract and his carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured payment of compensation as provided for in this chapter. A person who contracts with another . . . (b) [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation or profession of such person shall for purposes of this section be deemed a contractor, and such other person a subcontractor.

[4]As previously noted, Plaintiffs' claims against UGS were dismissed by the district court because of the exclusive remedy provision of the KRS statutes and that decision was not appealed.

"of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of the owner. If so, the owner is immune; if not, the owner is subject to tort liability." *Id*. at 585. The court defined "regular" as the type of work performed that is "customary, usual, or normal part of the premises owner's trade, business, occupation, or profession, including work assumed by contract or required by law." *Id*. at 586–87 (internal citations and quotations omitted). "Recurrent" was defined by the court as "work [that] is repeated, though not with the preciseness of a clock." *Id*. at 587 (internal citations and quotations omitted).

We must determine whether Siemens contracted with UGS to perform work that was a regular or recurrent part of Siemens' business. If so, Siemens is immune from tort liability to UGS' employees. We note, however, that the applicable holding in *Cain* identifies two ways in which a company may be defined as a contractor for purposes of tort liability. On the one hand, we find that Siemens' installation services should not be construed as regular work. Siemens acknowledged that the company "sometimes provides installation services," but is "primarily an equipment supplier." In addition, Don Watts, the contract manager for Siemens, admitted in his deposition that it is not Siemens' "normal business" to do "installation engineering" but that it is something Siemens agrees to do "if the client insists." (R. 247-3: Dep. Tr. of Don Watts 23-24.) He estimated that less than five percent of Siemens' contracts require installation. In short, Siemens' installation services are not "regular" work because they are not customary and of a kind that is normally performed or expected to be performed by Siemens' employees. 236 S.W. 3d at 588. Therefore, Siemens cannot claim tort immunity on this ground.

19

However, we nonetheless find that Siemens is immune from tort liability because we are persuaded by the fact that Siemens' installation work could be classified as recurrent work. Siemens has entered into eight sales contracts within the last ten years to provide installation services. In addition, Siemens has stated that when installation services are provided, "they are part and parcel of the contract for sale of equipment to the customer." These are clear indications that Siemens has provided recurrent work for installation services as defined by the Kentucky courts. *See Cain*, 236 S.W.3d at 588; *Fireman's Fund Insurance Company v. Sherman & Fletcher*, 705 S.W.2d 459, 462 (Ky. 1986) (finding that "a person who engages another to perform a part of the work which is a recurrent part of his business, trade, or occupation is a contractor"). Siemens has also continued to provide installation services since the NAS contract and indicates that this work is recurrent. *See Daniels v. Louisville Gas and Electric Company*, 933 S.W. 2d 821, 823 (Ky. App. 1996) (holding that LG&E may be classified as a contractor when it subcontracted with TSA to conduct emissions testing at irregular or sporadic intervals, which satisfied the definition of regular or recurrent work).

We find that Plaintiffs placed an unwarranted emphasis on the use of employees in the regular course of the business as controlling. While it is true that whether a company's employees normally perform the work is a factor, this fact is not dispositive as to the issue as to who is and who is not a contractor for purposes of Kentucky's Workers' Compensation statute. *See Cain*, 236 S.W.3d. at 589 (stating that "KRS 342. 610(2)(b) refers to work that is customary, usual, normal, *or performed repeatedly* and that the business or a similar business would perform or be expected to perform with employees") (emphasis added). Since Siemens satisfies the definition of recurrent work, the employer should be classified as a contractor under the Kentucky Workers Compensation

Statute and thus receive immunity from tort liability. We affirm the district court's grant of summary judgment in favor of Siemens.

### D. Negligence *Per Se* Claim Against NAS

Plaintiffs argue that NAS is *per se* negligent pursuant to the Kentucky Occupational Safety and Health Act ("KOSHA") and is individually liable for its failure to properly inspect and manage the safety of the worksite. Plaintiffs contend that the decision in *Hargis v. Baize*, 168 S.W.3d 36 (Ky. 2005), controls our understanding of whether NAS had control over the workplace. In *Hargis*, the court addressed the issue of whether the widow of an independent contractor who died as a result of an accident could recover for his wrongful death action. *Id*. at 39. The Kentucky Workers Compensation statute reads as follows:

> A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.

KRS § 446.070.

Plaintiffs allege that NAS was negligent in the death of Dilts by controlling the worksite and was therefore negligent *per se* under § 446.070. Specifically, Plaintiffs state that NAS exhibited control over the worksite by restricting access to the facility, that the installation of the doghouse was in NAS' meltshop, that the company maintained employees working in and around the installation, that NAS retained control over safety under its contract with Siemens, and that NAS took full control over the accident scene immediately after the death of Dilts.

NAS contends that Plaintiffs are precluded from recovering under KOSHA, and the company is not negligent *per se* because it was not the employer with respect to the construction job site. NAS

argues that Plaintiffs fail to present sufficient evidence to show that at the time of the accident, the accident site was a regular job site for NAS. NAS states that it took significant steps to separate its operational facilities and its employees from the project site. NAS also argues that it did not retain control over the contractor's employees or the work they were performing.

The district court and the KOSHA inspector both concluded that the degree of control exercised by NAS was insufficient to support a finding that NAS controlled the worksite. Here, the relevant question is whether NAS was obligated to comply with KOSHA standards and regulations in regards to Dilts as employee of an independent contractor. The district court examined:

> 1) whether there was evidence that, at the time of the accident, the accident site was a 'regular job site' for NAS; 2) whether NAS retained sufficient control of Siemens' employees or the work they were performing so as to be regarded as an employer responsible for violations of KOSHA; and 3) whether the contract conferred upon Siemens both the opportunity and responsibility to assure compliance with safety regulations.

(R. 324: Dist. Ct. Op. at 8.)

The issue in dispute is whether the emphasis should be placed on control over the work or control over the worksite. We find that the relevant issue is whether NAS had control over the worksite and agree with the analysis and conclusion stated by the district court that NAS did not possess control over the worksite. NAS took significant steps to demonstrate that it was not in control of the worksite at the time of the accident. The contract between NAS and Siemens required Siemens and its subcontractors to "assume responsibility for their own safe work practices and to perform their work in an OSHA compliant manner." In addition, the worksite was not physically part of NAS operational facility as most NAS employees were working in a separate building. NAS employees were only at the worksite to ensure that the parties were properly carrying out the terms

22

of the contract. Therefore, NAS is not *per se* negligent for failing to properly inspect and manage the safety of the worksite.

Plaintiffs also allege that in addition to negligence *per se*, NAS assumed responsibility for the safety of UGS' employees, including Dilts, and that NAS was negligent in attempting to shift safety responsibilities to Siemens. We agree with the district court that there must be evidence that the defendant has specifically undertaken to perform the task that he or she is charged with performing negligently. We find no evidence to support a conclusion that NAS either assumed the responsibility for Dilts or was negligent in delegating its safety responsibilities to Siemens. Therefore, we affirm the district court's order granting summary judgment to NAS on the negligence claim.

## CONCLUSION

For the reasons above, we **REVERSE** the district court's decision granting summary judgment to Maxim on its negligence claim, **REVERSE** the court's decision to exclude the expert testimony of Stuart Nightenhelser, and **AFFIRM** the district court's decision granting summary judgment to Siemens and NAS.

**JULIA SMITH GIBBONS, concurring.** I concur in the majority opinion but add a few observations about the common law negligence claim against Maxim. Our review of the district court's decision to exclude Nightenhelser's testimony is for abuse of discretion, and we have previously recognized the deference owed to a district court in its decisions about admissibility of expert evidence. *See, e.g., Mayhew v. Bell S.S. Co.*, 917 F.2d 961, 962 (6th Cir. 1990); *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 466 (6th Cir. 2012). While the district court was correct in its assessment that Nightenhelser could not say exactly how the fall of the panel occurred after the movement of the crane, the district court required too much. Nightenhelser was unequivocal in his opinion excluding scenarios other than that the crane moved improperly, the panel became dislodged as a result of this movement, and the dislodging ultimately caused the panel to fall. Although certainly the issue is disputed, the opinion that the crane moved is adequately supported by Nightenhelser's reliance on principles of physics (which are described in his affidavit with considerably more specificity than the district court took into account). The jury can decide whether or not the crane moved in evaluating his testimony and any lay testimony bearing on the issue. Nightenhelser's lack of a definite opinion as to every aspect of how the fall of the panel occurred relates more to the jury's evaluation of his core opinion than to the admissibility of his testimony. Nightenhelser's opinions are thus sufficiently reliable to permit their consideration by a jury. As a final matter, despite Maxim's arguments to the contrary, Nightenhelser seems clearly qualified to testify in the areas about which he was questioned. Thus, I conclude that the district court did abuse its discretion in excluding his testimony.

If Nightenhelser's testimony is admitted, there is sufficient evidence for the jury's consideration as to whether Maxim breached its duty of care and whether its actions caused the death of Dilts. Thus, summary judgment on the common law negligence claim was improperly granted.

**HELENE N. WHITE**, Circuit Judge, dissenting in part.

I concur in all but Part II.C. of the majority opinion, and also join in the separate concurrence. Because I conclude Siemens has not met its burden of demonstrating it is a contractor entitled to immunity under the Kentucky Workers' Compensation Act, I would reverse the judgment of the district court and remand plaintiffs' claim against Siemens.

Pursuant to section 342.690 of the Kentucky Workers' Compensation Act:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. For purposes of this section, the term "employer" shall include a contractor covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact, secured the payment of compensation.

Ky. Rev. Stat. Ann. § 342.690. Section 342.610(2) provides:

> A contractor who subcontracts all or any part of a contract and his or her carrier shall be liable for the payment of compensation to the employees of the subcontractor unless the subcontractor primarily liable for the payment of such compensation has secured the payment of compensation as provided for in this chapter. Any contractor or his or her carrier who shall become liable for such compensation may recover the amount of such compensation paid and necessary expenses from the subcontractor primarily liable therefor.

Ky. Rev. Stat. Ann. § 342.610(2)(b) defines "contractor" as a person who contracts with another:

> to have work performed of a kind which is a regular or recurrent part of the work, trade, business, occupation, or profession of such person . . . .

The purpose of section 342.610(2) is to "discourage owners and contractors from hiring fiscally irresponsible subcontractors and thus eliminate workers' compensation liability." *Matthews v. G&B Trucking, Inc.*, 987 S.W.2d 328 (Ky. Ct. App. 1998). To further this purpose, the statute

26

"impos[es] liability upon the 'up-the-ladder' contractor for compensation to the employees of a subcontractor unless the subcontractor has provided for the payment." *Pennington v. Jenkins-Essex Const., Inc.*, 238 S.W.3d 660, 663 (Ky. Ct. App. 2006) (quoting *Matthews*, 987 S.W.2d at 330.) Because of the possible liability that contractors face under this statute, "an entity 'up-the ladder' from the injured employee that meets all the requirements of KRS § 342.610(2) is entitled to immunity under KRS § 342.690 and has no [tort] liability to the injured employee of the subcontractor." *Id.* "[I]mmunity pursuant to the exclusivity provision of the Workers' Compensation Act is an affirmative defense that must be established by the claimant." *Id.* at 663-64.

Siemens' predecessor, Voest Alpine International, Inc., entered into a contract with NAS to sell equipment for an electric arc furnace (the doghouse), and to design, manufacture, and install the furnace. Because Siemens is primarily an equipment supplier, it subcontracted with UGS to perform the installation work. Siemens contends it is an up-the-ladder employer of Dilts under KRS § 342.610(2)(b) because the installation work that it subcontracted to Dilts's employer is a recurrent part of its business.

The record indicates that Siemens performs installation work in less than 5% of its contracts, has performed eight installations over the past ten years, only provides installation services when the customer demands it, and always subcontracts out the installation work because its employees do not perform that service. Siemens does not contend that installation is a *regular* part of its business. However, Siemens does claim that under *Daniels v. LG & E*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996), installation is a *recurrent* part of its business. In *Daniels*, the defendant LG & E contracted with Total Source Analysis, Inc. (TSA), to conduct emissions testing at its coal-fired plant. Because

27

environmental regulations only required LG & E to conduct emissions tests at periodic intervals, the testing was performed fourteen times over twenty-eight years. During one testing, a TSA employee was injured and subsequently sued LG & E. LG & E argued it was a contractor under Ky. Rev. Stat. Ann. § 342.610(2)(b), and thus immune from suit, because emissions testing was a regular or recurrent part of its business. *Daniels*, 933 S.W.2d at 823. The court rejected the employee's argument that the sporadic nature of LG & E's emissions testing meant it was not a regular or recurrent part of LG & E's business and stated:

> It is clear that LG & E has been required to perform the testing in the past, it will be so required in the future, and it contracts with specialists to perform the services. "Recurrent" simply means occurring again or repeatedly. "Regular" generally means customary or normal, or happening at fixed intervals. However, neither term requires regularity or recurrence with the preciseness of a clock or calendar. LG & E simply tested when and as required. Therefore, LG & E must be considered within the statutory definition of a "contractor" and relieved from tort liability in accordance with KRS 342.690.

*Id.* at 824; *see also Granus v. N. Am. Philips Lighting Corp.*, 821 F.2d 1253 (6th Cir. 1987) (work done periodically as part of routine plant maintenance is regular and recurrent within the meaning of KRS § 342.610 (2)(b)).

Subsequent to *Daniels*, the Kentucky Supreme Court clarified the meaning of "regular or recurrent" in *General Electric Company v. Cain*, 236 S.W.3d 579 (Ky. 2007). In *Cain*, the defendant businesses had contracted with various companies to have specific work performed on their premises. The plaintiffs were employees (or, where the employee had died, the estate of the employee) of the contracted companies who suffered from various diseases as a result of their exposure to asbestos while working on the defendants' premises. Each business claimed immunity from suit under Ky. Rev. Stat. Ann. § 342.690. To determine whether immunity applied, the court

evaluated whether the work performed by the various plaintiffs was a regular or recurrent part of each defendant's business. The court explained:

> Work of a kind that is a "regular or recurrent part of the work of the trade, business, occupation, or profession" of an owner does not mean work that is beneficial or incidental to the owner's business or that is necessary to enable the owner to continue in business, improve or expand its business, or remain or become more competitive in the market . . . It is work that is customary, usual, or normal to the particular business (including work assumed by contract or required by law) or work that the business repeats with some degree of regularity, *and it is of a kind that the business or similar businesses would normally perform or be expected to perform with employees.*
> . . . .
> The test is relative, not absolute. Factors relevant to the "work of the . . . business," include its nature, size, and scope as well as whether it is equipped with the skilled manpower and tools to handle the task the independent contractor is hired to perform.

236 S.W.3d at 588 (emphasis added).

After discussing these governing principles, the *Cain* court proceeded to apply them to the numerous defendants. The *Cain* court remanded all claims asserted by one group of plaintiffs against General Electric because the record "contained no substantial evidence that the plaintiffs performed regular or recurrent work of a type that General Electric or similar businesses would perform or be expected to perform with employees." 236 S.W.3d at 590. With respect to a different plaintiff who had worked on the premises of various defendants, the *Cain* court analyzed the work performed by the plaintiff at each location to determine whether that particular business was entitled to immunity. Where the plaintiff's work was either the same type of work, or not "significantly different" from the work performed by the business's own employees, the business was immune. *See, e.g.*, *id.* at 592, 594, 596, & 597. However, when the plaintiff's work was not the type performed by the business's own employees, nor of a kind that similar businesses would be expected

29

to perform with employees, the court found the business had shown it was entitled to immunity. *See, e.g.*, *id.* at 598, 600 & 602. In one instance, the court found that even though the type of work a plaintiff performed at Ford Motor Company was performed on a regular or recurrent basis there, Ford had not established it was entitled to immunity because "no evidence showed the work was of a kind that Ford or similar business would normally expect or be expected to perform with employees. " *Id.* at 598.

To determine whether a business is immune from liability under Ky. Rev. Stat. Ann. § 342.690, the pertinent questions are whether the contracted work is 1) "customary, usual, or normal to the particular business" or "work that the business repeats with some degree of regularity;" and 2) "of a kind that the business *or similar businesses* would normally perform or be expected to perform with employees." *Cain*, 236 S.W.3d at 588 (emphasis added). Thus, even if a particular business never uses its own employees to perform certain work, it will still be immune from liability under Kentucky's Workers' Compensation Act if that work is performed with some frequency *and* other businesses in that field would normally use their own employees to perform that type of work.

The record is devoid of any evidence demonstrating that equipment suppliers such as Siemens normally perform, or are expected to perform, installation work with employees. Accordingly, Siemens has not established that it is a contractor entitled to immunity under Kentucky's Workers' Compensation Act.